**VANGUARD PRODUCTS GROUP, INC., and Telefonix, Inc., Plaintiffs,**

v.

**DIAM USA, INC. and Diam International, Inc., Defendants.**

No. 05 C 1323.

United States District Court, N.D. Illinois, Eastern Division.

May 16, 2007.

Lee F. Grossman, Jeffrey Mark Drake, Mark M. Grossman, Grossman Law Offices, Bradley H. Foreman, Law Offices of Bradley H. Foreman, P.C., Chicago, IL, for Plaintiffs.

Charles Cobey Kinne, Fitch, Even, Tabin & Flannery, Chicago, IL, for Defendants.

## AMENDED MEMORANDUM OPINION AND ORDER

ELAINE E. BUCKLO, District Judge.

Plaintiffs Vanguard Products Group, Inc. and Telefonix, Inc. (collectively "plaintiffs") claim defendants Diam USA, Inc. and Diam International Inc. (collectively "defendants" or "Diam") infringe all claims of U.S. Patent No. 6,799,994 ("the '994 Patent"), by making, using, importing, offering to sell and/or selling within the United States cord reel management devices ("the accused device"). Defendants have filed motions for summary judgment for noninfringement and patent invalidity, and a motion to bar plaintiffs' damages claim.[1] Plaintiffs have filed a motion for summary judgment for infringement. For the following reasons, plaintiffs' motion for summary judgment for infringement is

---

1. Defendants also filed a separate motion for issuance of a *Markman* claim construction ruling, which is considered along with their motion for summary judgment for noninfringement as well as their response in opposition to plaintiffs' motion for summary judgment for infringement.

granted, and defendants' motions are denied.

## I.

This is a patent dispute among competitors who sell theft-reduction systems for the retail display and sale of electronics. These theft-reduction systems permit retailers to display electrically powered hand-held devices, such as camcorders or digital cameras, while simultaneously reducing the risk of theft. As described in the '994 patent abstract, the patent is for

> A cord management apparatus that provides for the convenient management of cords associated with the retail display of small electronic devices, such as video cameras. The apparatus comprises a multi-conductor cable, a mounting member for mounting the electronic device, an adapter for connecting the cable to the electronic device, and a base member for removably holding the mounting member. The base member is fastened to a display rack or counter. A plurality of adaptors are provided so that the apparatus may be used with a wide variety of devices that may have different connection requirements.

Specifically, the invention is comprised of (1) a power source, (2) alarm box, (3) cord reel, (4) first (retractable) cable assembly, (5) mounting member, and (6) a second (modular) cable assembly to secure the displayed electronic device. (*See* Pl. Resp. to Def. Mot. at Exh. 4.) Power travels through the invention and into the displayed device in the same order in which the parts are identified.

This theft-reduction system works as a result of electronic signals. Power travels from the power source through the invention and into the displayed device, allowing customers to operate and evaluate the powered displayed device while extending it away from the display. Because there is an electronic signal from the alarm box to the displayed device, if a customer re-moves the device or cuts the retractable cable, an alarm sounds alerting store personnel. If a display is changed and a different device with different power requirements is placed in the display, the second cable assembly is replaced with a different cable assembly that has the appropriate power requirement for the newly displayed device. The remaining parts remain unchanged.

Plaintiffs consist of the technology company (Telefonix, Inc.) founded by Paul Burke, the inventor of patent '994, and the exclusive licensee of the patent with rights to sue for patent infringement (Vanguard Products Group, Inc.). Plaintiffs are in the business of selling their product to large retail stores such as Wal–Mart, Circuit City, Best Buy, and Sears. Defendants Diam, and their predecessors, were in the business of selling display furniture or fixtures with integrated security systems made by other companies, such as plaintiffs. Defendants claim that in 2002 they realized plaintiffs' system was inadequate, as it is limited to providing three voltage levels, whereas the market began to demand dozens of voltages to power the growing number of hand-held electronic devices. As a result, defendants decided to develop and manufacture their own technology, which they introduced in November 2002. Plaintiffs filed the complaint in this action in March 2005.

## II.

An infringement analysis involves two steps. *J & M Corp. v. Harley–Davidson, Inc.*, 269 F.3d 1360, 1366 (Fed.Cir.2001). First, a court must determine as a matter of law the scope and meaning of the claims through claim construction. *Id.* Second, the construed claims must be compared to the allegedly-infringing device. *Id.* Summary judgment is appropriate where the record shows that there is no genuine is-

sue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999); FED.R.CIV.P. 56(c). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. Claim Construction

 In claim construction, the terms of the claim must be given the ordinary and customary meaning that the terms would have to a person of ordinary skill in the art at the time of the filing date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.Cir.2005). In construing claims, I must first examine the intrinsic evidence, i.e., "the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). The specification of a claim provides the "primary basis" for construing disputed claim language, because it contains the inventor's statutorily required "full" and "exact" description of the claimed invention. *Phillips*, 415 F.3d at 1315–16 (citations omitted) (specification "is the single best guide to the meaning of a disputed term").

The patent's prosecution history should also be considered, if in evidence. *Id.* at 1317. This generally consists of the complete record of the proceedings before the Patent and Trademark Office ("PTO") and the prior art cited during the patent's examination. *Id.* Like the specification, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention." *Id.* However, the prosecution history is not conclusive; as it "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful." *Id.*

 I may also consider extrinsic evidence during the claim construction process. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed.Cir.1995)). While I may rely upon extrinsic evidence, it is "less significant than the intrinsic record in determining the legally operative meaning of the claim language." *Id.* at 1317 (quotations omitted). Generally, courts may consult dictionaries and technical treatises "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322–23 (quotations omitted).

The '994 patent has two independent claims and nine dependent claims. The terms presented for construction are "electrically coupled" and "via the modular connector," which are present in each of the independent claims numbered 1 and 8. Claim 1 states:

1. A cable management apparatus for use with a plurality of electronic devices, comprising:

a first cable assembly having a length, a modular connector, and a plurality of electrical conductors;

a reel that retractably stores at least a portion of the length of the first cable assembly;

a mounting member adapted to receive an end of the first cable assembly and at least one of the plurality of electronic devices; and

a second cable assembly from a plurality of cable assemblies associated with

the plurality of electronic devices, wherein the second cable assembly is adapted to *electrically couple* the[sic] at least one of the plurality of electronic devices to the end of the first cable assembly, and

wherein the first cable assembly is configured to be *electrically coupled* to each of the plurality of cable assemblies *via the modular connector.*

'994 Patent, col. 7, cl. 1 (emphasis added). Claim 8 states:

8. A cable management system, comprising:

a plurality of retractable cable assemblies, each of which includes a length, a modular connector, a multi-conductor cable, and a retractable reel on which at least a portion of the length at the multi-conductor cable is wound; and

a plurality of modular cable assemblies, each of which is associated with at least one of a plurality of electronic devices and each of which includes a first end adapted to be *electrically coupled* to the multi-conductor cable and a second end adapted to be *electrically coupled* to one or more of the plurality of electronic devices,

wherein each of the plurality of retractable cable assemblies is configured to be *electrically coupled* to each of the plurality of modular cable assemblies *via the modular connector.*

'994 Patent, col. 8, cl. 8 (emphasis added).[2] Neither "electrically coupled" nor "modular connection" appear in the patent specification. Both were added during the prosecution of the patent.

### 1. "Electrically Coupled"

■ Defendants ask me to construe "electrically coupled" as "directly, electri-

cally connected currents or circuits where each current or circuit always has equal electrical potential (voltage)." Plaintiffs seek a broader construction of the terms to mean "electrically connected," but not requiring a direct electrical connection or the same voltage. I agree with plaintiffs.

#### a. Intrinsic Evidence

Since this combined term is not defined in the specification, both parties point to the context in which the term is used in the claim in support of their arguments. According to defendants, the plain language in claim 1 and 8 must be taken together and requires that "electrical coupling" occur only through direct wire-to-wire connections in which each electrical current always has an equal potential. Specifically, defendants point to the language in claim 1 which states

wherein the second cable assembly is adapted to electrically couple the[sic] at least one of the plurality of electronic devices to the end of the first cable assembly, and

wherein the first cable assembly is configured to be electrically coupled to each of the plurality of cable assemblies via the modular connector.

Defendants read both references to the term together, arguing it requires that the second cable assembly and first cable assembly electrically couple by way of the modular connector of the first cable assembly. Defendants further argue that claim 8 has a similar structure as claim 1, but adapted to the two groups of cable assemblies instead of the two individual cable assemblies claimed in claim 1. Therefore, the same interpretation should apply.

---

2. The parties agree that their arguments about the language in claim 1 apply with equal force to claim 8, which uses the terms "plurality of retractable cable assemblies" and "plurality of modular cable assemblies" in place of the terms "first cable assembly" and "second cable assembly" respectively. The disputed claim terms are the same.

Plaintiffs' construction of claim 1 is grounded on a different reading of the same text. Plaintiffs point out that "the second cable assembly is adapted to electrically couple the electronic device to the end of the first cable assembly. . . ." Accordingly, "electrically couple" cannot be limited to a direct wire to wire connection, as the electronic device and the first cable assembly are connected by the second cable assembly and are not in direct contact as described in the claim. As set forth in the claim and the specification, the second cable assembly physically separates the electronic device from the first cable assembly; therefore the electronic device is not directly coupled to the first cable assembly. Next, plaintiffs read "and wherein the first cable assembly is configured to be electrically coupled to each of the plurality of cable assemblies via the modular connector" as stating that the first cable assembly is electrically coupled to the second cable assembly, despite not being in direct physical contact.

Overall, the claims at issue do not contain language limiting the term to require direct wire-to-wire coupling or equal voltage. The claim language, setting forth the structure of the invention, is not compatible with defendants' construction. Furthermore, the fact that this is a combined term of the words "electrically" in addition to "couple" weighs in favor of plaintiffs' construction. The use of the word "electrically" suggests the combined term here has a meaning different than just "coupled." *See, e.g., Phillips,* 415 F.3d at 1314 (the term "steel baffles ... strongly implies that the term 'baffles' does not inherently mean objects made of steel") (citing *Mars, Inc. v. H.J. Heinz Co.,* 377 F.3d 1369, 1374 (Fed.Cir.2004)) (claim term "ingredients" construed in light of the use of the term "mixture" in the same claim phrase); *Process Control Corp. v. HydReclaim Corp.,* 190 F.3d 1350, 1356 (Fed.Cir. 1999) (claim term "discharge rate" con-

strued in light of the use of the same term in another limitation of the same claim). The claim language here provides "a firm basis for construing the term." *Id.* at 1314. The nature of the electrical connection is not restricted by the claim language to direct physical coupling or with respect to voltage.

Defendants invoke the remainder of the specification in support of their proposed construction. They argue the preferred embodiments, illustrated in figures 1 and 2 of the '994 patent, describe examples of electrical coupling with wire-to-wire electrical connections with equal voltage on both sides of the connection. The weight to be afforded this argument is limited, however. The Federal Circuit has "repeatedly warned against confining claims to [the preferred] embodiments." *Id.* at 1323 (citing *Nazomi Communications, Inc. v. Arm Holdings, PLC,* 403 F.3d 1364, 1369 (Fed.Cir.2005); *Liebel–Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 906–08 (Fed.Cir.2004); *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1327 (Fed.Cir. 2002); *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1121 (Fed.Cir. 1985)); *see also Markman,* 52 F.3d at 980 ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1117 (Fed.Cir.2004) (citations omitted) ("particular embodiments appearing in the written description will not be used to limit claim language that has broader effect"). In fact, the specification here states "that the description of the preferred embodiment is not intended to limit the invention in any manner." '994 Patent, Col. 4, lines 54–56. Furthermore, the preferred embodiments are not inconsistent with the claim language. They illustrate that the second cable assembly physically separates the electronic device

from the first cable assembly; therefore, the electronic device is not directly coupled to the first cable assembly despite the claim's language that these two are "electrically coupled."

Defendants also point to the prosecution history of U.S. Patent No. 6,386,906 ("the '906 parent application") in support of their construction. (Def.Exh. C, D, J, K, L, M, N.) Specifically, Diam argues that because claims 14 and 19 in the '906 parent application state that the modular adapter (the second cable assembly) was "selectively electrically connected to one of the conductors carrying one said voltage," (which is the first cable assembly) it necessarily described "electrically connected" as a direct connection having the same voltage. Diam also argues that because the '906 amendments describe those claims as "electrically connected" an electrical connection is limited to a direct connection having the same voltage.

In order for a patent's prosecution history to limit a claim term, there must be an "unequivocal disavowal" to disclaim the scope of a claim. *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed.Cir.2005). Arguments made during the prosecution of other claims different from the claim terms at issue are not applicable to claim terms in a subsequent patent. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed. Cir.2005) ("the prosecution of one claim term in a parent application will generally not limit different claim language in continuation application."); *SanDisk*, 415 F.3d at 1286 ("When the patentee makes clear and unmistakable prosecution arguments limiting the meaning of a claim term in order to overcome a rejection, the courts limit the relevant claim scope to exclude the disclaimed subject matter.").

In this case, claims 14 and 19 were expressly limited to having a direct connection as they state "a module adapter [i.e. the second cable assembly], a first of said adapter having an electrical connector mating with said cable second connector [i.e. the first cable assembly]." (Diam Ex. J, p. 3.) The use of the term "mating" explains the existence of physical contact. The '906 amendments describe this as an "electrical connection," not an "electrical coupling." The use of different, broader terms in the continuation patent weigh against defendants' construction. Accordingly, the '906 parent application does not contain any clear, unmistakable or unequivocal disclaimer or disavowal limiting the term "electrically couple" to a direct electrical connection with equal voltage.

### b. Extrinsic Evidence

A number of technical dictionaries corroborate the plaintiffs' construction of "electrically couple". Specifically, the Academic Press Dictionary of Science and Technology (Academic Press 1992), defines "coupling" for electricity as "1. a means for transferring power from one stage of a circuit to another stage, or from one circuit to another circuit. 2. A hardware mechanism used to fashion a temporary connection between two wires." Wire and Cable for Electronics: A User's Handbook defines "coupling" as "[t]he transfer of energy between two or more cables or components in a circuit." Neil Sclater, Wire and Cable For Electronics: A User's Handbook (McGraw–Hill 1991). McGraw–Hill Dictionary of Scientific and Technical Terms (6th ed.2003) defines "couple" as "[ELEC] To connect two circuits so signals are transferred from one to the other." Even the dictionary definition of "coupled," supplied by defendants, does not require a direct wire-to-wire connection or equal voltage, instead stating "Electricity connection of electrical circuits: a means of connecting two electrical circuits so that power can be passed between them, or the process of connecting

electrical circuits in this way." (Def. Exh. W, MSN Encarta Dictionary.)

## 2. "Via the Modular Connector"

■ Although the parties purport to disagree over the construction of these combined terms, in essence the real dispute is over the implication of this language on the construction of the remaining terms of the claims, specifically "electrically couple." Defendants ask that I construe "via modular connector" as "by way of an electrical connector constructed with standardized units or dimensions," which in turn requires adopting the construction of "electrical couple" as a direct wire-to-wire connection with equal voltage. Plaintiffs agree with the definition of "modular connector" but not of "via." Plaintiffs construe these combined terms simply to mean "through an electrical connector constructed with standardized units or dimensions," and not requiring a direct wire-to-wire connection with equal voltage. I agree with plaintiffs.

### a. Intrinsic Evidence

"Via the modular connector" does not appear in the remainder of the specification, so once again both parties argue its context in the claim language supports their construction. Defendants argue the phrases "electrically couple" and "via the modular connector" must be read together, and because coupling occurs "by way of the modular connector" it is clear that the coupling is direct and wire-to-wire. Plaintiffs argue defendants' construction is not consistent with the remainder of the claim language and that "electrically couple" and "via the modular connector" need not be interpreted together as requiring direct contact, for "via the modular connector" only appears once in claim 1 and claim 8 respectively, and the term "electrically couple" is used a number of times in other claims without the term "via the modular connector." Similarly, the term "modular

connector" is previously identified in the claim, independent from "electrically couple."

As set forth in claim 1, "the first cable assembly is configured to be electrically coupled to each of the plurality of cable assemblies via the modular connector." Once again, the structure of the invention as set forth in the language of the claims and specification weighs in favor of plaintiffs' construction. For one, the modular connector is identified as a separate part of the invention, therefore the text could be read as "electrically coupling" two separate parts of the invention, via a third distinct part. Accordingly, the electrical connection among the cable assemblies is not direct, but through a third part—the modular connector. Furthermore, although the first cable assembly is electrically coupled to the second cable assembly through the modular connector, i.e. electricity travels from the first cable assembly through the modular connector and into the second cable assembly, there is no requirement that the modular connector on the first cable assembly be directly connected to the second cable assembly. Electrical power can travel from the first cable assembly through the modular connector, through the mounting member, and to the second cable assembly. An electrical connection would still exist among these parts, via the modular connector, despite their failure to have a direct, wire-to-wire connection. This is consistent with the adopted construction for "electrically couple" as well.

■ Defendants also point to the remainder of the specification for an example consistent with their proffered definition. In the example, the modular connector is common to all the cable assemblies at the junction of the first cable issuing from the reel and the camera cable. (*See* '994 Patent, Figs. 1, 2.) Defendants also invoke

U.S. Patent No. 5,094,396 ("the '396 patent"), which is referred to in the specification of the '994 patent when describing a cord reel. However, "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water*, 381 F.3d at 1117 (citations omitted). The examples in the specification, including the referenced '396 patent, simply do not dictate the claim terms be construed to require a direct, wire-to-wire coupling among all parts identified as "electrically coupled." *See Ventana Medical Systems, Inc. v. Biogenex Laboratories, Inc.,* 473 F.3d 1173, 1180 (Fed.Cir.2006) ("district court improperly imported limitations from the specification.") This would be inconsistent with the claim language.

Defendants also resort to the prosecution history of the '994 patent. The term "modular connector" was added to claim 1 in order to distinguish plaintiffs' invention from the art of record. As already discussed, however, the plaintiffs do not dispute defendants' construction of "modular connector," but of "via." Neither party points to any part of the prosecution history which elaborates on this term. Defendants do argue, without any citation to the record, that "the '994 patent application points out the structure of such a modular connector at the distal end of the first cable assembly mates with the proximal end of the second cable assembly." (Def. Markman Br. at 23.) Even assuming the record supports this assertion, defendants fail to explain why this makes the proper construction of "via" "by means of" instead of "through" and why this requires "electrical coupling" occur only through direct wire connections.

The intrinsic evidence does not contain language limiting the term to require direct wire-to-wire coupling or equal voltage. Neither the claim language nor specification restrict the claims to require a direct

wire-to-wire connections among all the parts that are identified as "electrically coupled." The fact that the claim states that the modular connector serves to "electrically couple" certain parts is not enough to read in the limitations included in defendants' construction.

b. Extrinsic Evidence

The dictionary definition provided by defendants for "via" is "by way of" or "by means of." This is not inconsistent with plaintiffs' construction, nor is it of much significance in determining whether "via" requires a direct wire connection with equal voltage.

Overall, in light of all of the intrinsic and extrinsic evidence, I adopt plaintiffs' construction for "electrically couple" as "electrically connected" without requiring a direct, wire-to-wire connection. Similarly, I adopt plaintiffs' construction for "via the modular connector" as "through" the modular connector, but without requiring a direct wire-to-wire connection or equal voltage.

### B. Comparing the Claims to the Accused Device

■■■■■ Plaintiffs allege literal infringement of the '994 patent. "Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim." *Catalina Mktg. Int'l Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 812 (Fed.Cir.2002). "All claim limitations are significant and must be considered." *Key Mfg. Group, Inc. v. Microdot, Inc.,* 925 F.2d 1444, 1447 (Fed.Cir.1991) (quotations omitted). A finding of infringement is an issue of fact, but "[j]udgment as a matter of law of no literal infringement is appropriate if no reasonable fact finder could determine that the accused devices meet every limitation of the properly construed claims." *Elkay*

*Mfg. Co. v. Ebco, Mfg. Co.,* 192 F.3d 973, 980 (Fed.Cir.1999).

■ Conversely, defendants seek summary judgment for noninfringement. Summary judgment of noninfringement is proper where there is no genuine issue as to whether the accused device lacks a single claim element. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.,* 324 F.3d 1308, 1321 (Fed.Cir.2003).

■ Defendants argue two limitations found in the two independent claims of the '994 patent are not present in the accused device. Their first argument is that the accused product does not "electrically couple" the identified parts through direct wire connections, because the accused device's mounting member contains internal circuitry which separates the wires connected on each side of the mounting member. This dispute, however, is of no avail in light of the adopted construction of "electrically couple."

Second, defendants dispute that electricity flows from the first cable assembly directly to the second cable assembly via the modular connector. Defendants' argument is that the accused device has no direct wire coupling among the first cable assembly and second cable assembly with equal electrical voltage because of the mounting member, which separates the assemblies by its internal electrical circuitry. Once again, this argument runs afoul of the court's construction of the terms, which does not require a direct wire connection among the assemblies.

In light of the adopted constructions of the terms at issue, as well as defendants' concessions concerning the two disputed limitations among the '994 patent and the accused device, I find there is no genuine issue of material fact that the accused device literally infringes on the '994 patent.[3] Accordingly, plaintiffs' motion for summary judgment for infringement is granted and defendants' motion for summary judgment of noninfringement is denied.

### III.

Defendants also seek summary judgment on the basis that the patent is invalid. Diam argues two prior art references were not considered during the prosecution of the application and, therefore, all the claims of the '994 patent are invalid under 35 U.S.C. § 102. According to Diam, Jansen U.S. Patent No. 5,547,393 ("Jansen") issued August 20, 1996, anticipates Claims 1–2 and 6–11 of the '994 patent under 35 U.S.C. § 102(b); and Edwards U.S. Patent No. 5,671,833 ("Edwards") issued September 30, 1997 on an application filed on April 23, 1996, anticipates Claims 1–5 and 7 under 35 U.S.C. § 102(e).

■ Claims are presumed valid, 35 U.S.C. § 282, and any conclusion of invalidity must be supported by clear and convincing evidence. *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1575 (Fed. Cir.1987). A patent claim is invalid as anticipated under 35 U.S.C. § 102(b) if the claimed invention was patented or described in a printed publication more than one year prior to the date of the application for patent in the United States. A patent claim is invalid as anticipated under 35 U.S.C. § 102(e) if the claimed invention was described in a patent by another for

**3.** Defendants claim to have additional arguments contesting the presence of various structures in the accused device which they chose not to disclose in opposing plaintiffs' motion for summary judgment. (Def. Resp. at 5 n.2.) Those arguments are waived with respect to plaintiffs' motion for summary judgment. *See Black & Decker, Inc. v. Robert Bosch Tool,* No. 04 C 7955, 2006 WL 3883937 at *2 (N.D.Ill.Dec.27, 2006) (St.Eve, J.) (citations omitted) (undeveloped arguments are waived).

which the U.S. application was filed before the date of invention by the applicant for the patent issue. "A single prior art reference anticipates a patent claim if it expressly or inherently describes each and every limitation set forth in the patent claim." *Trintec Indus. Inc. v. Top–U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed.Cir.2002) (citing *Verdegaal Bros., Inc. v. Union Oil Co.*, 814 F.2d 628, 631 (Fed.Cir.1987)). "Inherent anticipation requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art." *Id.* (citing *In re Robertson*, 169 F.3d 743, 745 (Fed.Cir. 1999)).

### A. Jansen

■■ Defendants argue Jansen is a prior art reference that was not considered during the prosecution of the application and anticipates claims 1–2 and 6–11 of the '994 patent under 35 U.S.C § 102(b). Jansen specifically claims:

1. A beauty salon appliance workstation, comprising: a plurality of beauty salon appliances;

a cabinet having a plurality of receptacles, each of said receptacles adapted to receive one of said plurality of beauty salon appliances;

a plurality of retractable extension cords disposed within said cabinet, each of said retractable extension cords having a single female electrical outlet;

means allowing said retractable extension cords to be extended outside said cabinet;

means preventing said electrical outlets from being retracted inside said cabinet;

means supplying electrical power to said retractable extension cords; and

said plurality of beauty salon appliances having "pigtail" type power cords with single male electrical plugs whereby each of said male electrical plugs is connected to a respective one of said female electrical outlets such that, when said retractable extension cord is retracted, no substantial dangling loop of said power cords exists.

2. The beauty salon appliance workstation of claim 1 where each of said receptacles further comprise a slot portion to receive said "pigtail" type power cord.

(Jansen, Col.4–6, cl.1–2.)

Jansen is not clear and convincing evidence of invalidity on claims 1–2 and 6–11 of the '994 patent. With respect to independent claim 1 of the '994 patent, there are a number of differences among Jansen and the '994 patent. First, Jansen does not disclose a "mounting member," but rather a "cabinet" which serves as a type of stationary base. The '994 patent refers to both a "mounting member" and a "base that holds the reel and is adapted to be mounted to a surface associated with a product display." This suggests that the mounting member is distinct. Second, Jansen does not disclose a separate "second cable assembly" which provides an electrical signal between the displayed device and the mounting member and first cable assembly, and which provides an adapter for different power requirements. In contrast, Jansen discloses the beauty salon appliances' own "pigtail" type power cords are "connected to a respective one of [ ] female electrical outlets" which extend from the cabinet.

Defendants' arguments that Jansen anticipates independent claim 8 mirror those for claim 1. Once again, plaintiffs point to the absence of second cable assemblies in Jansen. Defendants erroneously argue the existence of "the second cable modular assemblies" in Jansen; in fact these are not part of the invention but cords that belong to and are permanently attached to the appliance itself.

Finally, claims 2, 6, 7, and 9–11 are all dependent on claims 1 and 8. Neither par-

ty argues the dependent claims are narrower than claims 1 and 8. Accordingly, because defendants have not presented clear and convincing evidence of invalidity on independent claims 1 and 8, I need not consider any additional limitations in each of the remaining claims. Summary judgment on the basis of invalidity under 35 U.S.C. § 102(b), with respect to Jansen, is denied.

### B. Edwards

Defendants claim Edwards anticipates claims 1–5 and 7 of the '994 patent by disclosing all elements of those claims. The Edwards patent generally discloses a coaxial cable management assembly that is structured for use with many different electronic devices, such as computers, televisions, radios or other electronic devices. Plaintiffs dispute that Edwards anticipates claim 1 on the grounds that it does not disclose a mounting member or a second cable assembly. I agree. Edwards does not disclose a mounting member that receives a product cable and an end of the first cable assembly. The identified "threaded terminus" in Edwards is distinguishable from a mounting member, and appears more like a connecter at the end of the coaxial cable. Furthermore, Edwards only discloses one cable and not a second cable assembly that couples each electronic device to the first cable assembly. Nor does Edwards have a second cable assembly from a plurality of second cable assemblies associated with a plurality of electronic devices.

Claims 2–5 and 7 are dependent claims. Neither party has argued these claims are narrower than claim 1. Accordingly, be-

cause defendants have not presented clear and convincing evidence of invalidity on independent claim 1, I need not consider any additional limitations in each of the remaining claims. Summary judgment on invalidity under 35 U.S.C. § 102(e) with respect to Edwards is denied. Therefore, defendants' motion for summary judgment on invalidity is denied in its entirety.

### IV.

Defendants have also filed a motion to bar plaintiffs from recovering damages, alleging that plaintiffs have failed to provide any fact discovery to support a damages claim. Plaintiffs respond that under the parties' scheduling order, which was approved on June 22, 2006, the parties agree that "should additional expert discovery be required as a result of the Court's rulings on the parties' summary judgment motions, such as to address damages ... an additional period of roughly sixty days for expert discovery will be permitted following the Court's rulings on those motions." (Sched. Order. at § 6.) In light of the agreed scheduling order and plaintiffs' assertion that the damages issues are to be addressed by experts, defendants' motion is denied.[4]

### V.

For the foregoing reasons, plaintiffs' motion for summary judgment on infringement is granted, and defendants' motions for summary judgment on noninfringe-

4. Moreover, on July 7, 2006, plaintiffs served a Second Supplemental Response to Diam's interrogatory regarding damages calculations, providing that damages would be based on lost profits for each sale made by defendants of an infringing product and no less than a reasonable royalty, as well as realized profits on convoyed sales of product associated with the patented device. (Pl.Resp.Exh.5.) Plaintiffs' response to defendants' interrogatory also stated that "to the extent this interrogatory seeks expert opinions, this interrogatory will be supplemented during expert discovery." (Id.) Defendants did not file an objection or motion seeking to compel additional damages discovery.

ment and patent invalidity, and to bar plaintiffs' damages claim are denied.