# United States Court of Appeals for the Federal Circuit

DOW JONES & COMPANY, INC. AND
DOW JONES REUTERS BUSINESS INTERACTIVE,
LLC,
(DOING BUSINESS AS FACTIVA),
*Plaintiffs-Appellees,*

v.

ABLAISE LTD. AND GENERAL INVENTIONS
INSTITUTE A, INC.,
*Defendants-Appellants.*

2009-1524

Appeal from the United States District Court for the District of Columbia in case nos. 06-CV-01014 and 06-CV-01015, Judge James Robertson.

Decided: May 28, 2010

STEVEN M. LIEBERMAN, Rothwell, Figg, Ernst & Manbeck, P.C., of Washington, DC, argued for plaintiffs-appellees. With him on the brief were SHARON L. DAVIS, BRIAN S. ROSENBLOOM and OLIVER L. EDWARDS.

JACOB M. HOLDREITH, Robins, Kaplan, Miller & Ciresi, L.L.P., of Minneapolis, Minnesota, argued for defen-

dants-appellants. With him on the brief were RONALD J. SCHUTZ, CYRUS A. MORTON, TREVOR J. FOSTER and PATRICK M. ARENZ. Of counsel was SETH A. NORTHROP.

———————————

Before MICHEL, *Chief Judge*, RADER, *Circuit Judge*, and FOLSOM\*, *District Judge*

MICHEL, *Chief Judge*.

This appeal arises from a decision of the United States District Court for the District of Columbia granting summary judgment of invalidity against appellants Ablaise Ltd. and General Inventions Institute A, Inc.'s (collectively, "Ablaise") U.S. Patent Nos. 6,961,737 (the '737 patent) and 6,295,530 (the '530 patent). Specifically, the district court held that the asserted claims of the '737 patent were invalid as obvious under 35 U.S.C. § 103 and that the asserted claims of the '530 patent were invalid under 35 U.S.C. § 102 as anticipated by prior art. Additionally, Ablaise appeals the district court's denial of its motion to dismiss appellees' Dow Jones & Co., Inc. and Dow Jones Reuters Interactive, LLC's (d/b/a Factiva) (collectively, "Dow Jones") claim against the '530 patent on the grounds that Ablaise's proffer of a covenant not to sue Dow Jones for infringement of that patent divested the court of subject matter jurisdiction. For the reasons set forth below, we reverse the district court's denial of Ablaise's motion to dismiss Dow Jones' invalidity claim against the '530 patent and affirm the district court's grant of summary judgment that the asserted claims of the '737 patent are invalid as obvious. Because the district court lacked subject matter jurisdiction to hear Dow Jones' claim against the '530 patent, this court cannot

———————————

\*    Hon. David Folsom, Chief Judge of the U.S. District Court for the Eastern District of Texas, sitting by designation.

reach the question of whether the asserted claims of that patent are invalid.

I.

*A. The Patents-in-suit*

The '737 and '530 patents-in-suit both claim a method for generating computer web pages that are generated and customized for the specific individual viewing them based upon information encoded in the signal sent to the location generating the pages.

In the early 1990s, the continuing development and increasing availability of the Internet and the arrival of more powerful personal computers ("PCs") set the stage for the advent of the World Wide Web (the "Web"). The functioning of the Web depends upon a basic technology, Hypertext Transfer Protocol ("HTTP") and a computer language, Hypertext Markup Language ("HTML"). HTTP is an Internet protocol that enables a Web browser (a program installed upon an individual's PC) to request a Web server (a Web site at which information is stored) to send specific content in the form of a Web page to the user's Web browser. This content includes information, in the form of HTML content, which specifies the formatting of the layout and informational content of the web page displayed on the PC user's computer screen.

HTML is a language embodying sets of instructions that control the format of a Web page displayed on the browser application of a user's PC. HTML employs particular instructions, known as "tags" to determine the appearance of a Web page. A tag is designated by placing the instruction within the symbols < >. For example, the tag <b> indicates that the text following the tag should be in boldface type and the tag </b> indicates the end of the boldface text sequence. It is undisputed that by May 15, 1995 (the priority date claimed by the '737 patent and the

'530 patent), HTML was well known to persons of ordinary skill in the art of Web design.

In the nascent days of the Web, Web pages were typically constructed and stored as single, invariant hand-coded pages. Thus, for a company making its catalogue available on the Web, each product in the catalog required that its own page be individually constructed and stored separately. Needless to say, for a company that offered hundreds or thousands of changing products, constructing a page for each was extremely labor-intensive. Moreover, each Web page so constructed and stored would appear identical upon every user's screen, regardless of the user's preferences or her PC's capabilities.

A more flexible and less costly solution to this situation is to dynamically generate Web pages upon user demand (colloquially referred to as being generated "on the fly"). In this method, the HTML formatting information for a given Web page would be generated automatically only after the page was requested by the PC user. It is undisputed by the parties that by May 15, 1995, the ability of Web Site developers to construct Web pages on the fly by using programs known as Common Gateway Interfaces ("CGI programs" or "CGI scripts") was well known in the art. CGI programs are standard protocols that define how the software of a Web server delegates the generation of Web pages to the browser on a user's PC. Using a CGI program, a person of ordinary skill in the art could create individualized, dynamically-generated Web pages for each end user.

The '737 and '530 patents each claim methods for using a Web server to send individualized content and formatting instructions in the form of Web pages that are generated on the fly in response to user preference information encoded in the user's HTTP request for the specific Web page. At issue in this appeal are claims 1, 3, 4, and 6 of the '737 patent and claims 1-3 of the '530 patent.

However, in the district court, both parties focused on the first claim of each patent, agreeing that if that claim is invalid, the remaining asserted claims are also invalid. Claim 1 of the '737 patent discloses:

A method for serving pages of viewable data to browsing devices connected to a network, wherein a page of said viewable data comprises content data defining text and/or graphics and formatting data which specifies locations of said text and/or graphics within a page, and said viewable data is displayed at a browsing device such that locations of said text and/or graphics depend on said formatting data, said method comprising:

identifying requests from browsing devices that define a request for specified content data; storing content data;

storing executable functions;

maintaining a user database comprising information relating to user preferences;

and in response to identifying a request for specified content data and a user identifier;

(a) reading user preference information from said user database in response to a received user identifier;

(b) selecting stored content data in dependence upon the content data specified in a received request;

(c) receiving format identifiers identifying the type of formatting required;

(d) selecting a set of stored functions in dependence upon a received format identifier and said read user information; and

(e) executing said set of functions to generate viewable data comprising said selected content data and formatting data.

'737 patent col.19 l.65-col.20 l.16. Claim 4 teaches a "serving device" that performs the method recited in claim 1. Claim 3 is identical to claim 1 except that it requires that the "viewable data" be "HTML data" and that the "formatting data" comprise "HTML tags." Claim 6 adds the same "serving device" limitation to claim 3 that claim 4 adds to claim 1.

Claim 1 of the '530 patent discloses:

A method of serving output signals from a serving device to a plurality of browsing devices connected to a network, wherein said output signals represent commands executable by a browsing device so as to display viewable data in accordance with a specified page format; said method comprising steps of:

identifying requests from browsing devices that define a request for specified viewable data, said

request including formatting type identification data;

maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data;

storing content data representing said viewable data;

selecting a specific part of said content data representing specific viewable data;

selecting a specific one of said types of formatting data in response to said formatting type identification data;

processing said content data and said formatting types of data so as to combine said selected part of said content data with said specific one of said types of formatting data, and for outputting processed viewable data with executable instructions; and

supplying output signals to the requesting browsing device derived from said output processed data,

in which said output signals represent commands executable by a browsing device so as to display

said specific viewable data in accordance with a first specified page format when a first type of formatting data is selected and in a second specified page format when a second type of formatting data is selected.

'530 patent col.19 l.55-col.20 l.19. Claim 2 requires that the "content data" include "graphics data." Claim 3 requires that a "serving device" perform the method described in claim 1.

The patents differ from one another in two relevant respects. First, the method claimed by the '737 patent is capable of more flexible formatting than that claimed by the '530 patent. The '737 patent discloses a method of generating Web page formatting that coincides with a user's individual preferences, whereas the '530 patent limits a user's formatting options to certain prescribed templates which can be chosen by the user.

Second, only the '737 patent discloses a server that stores the user's preferences in a database to be matched against subsequent requests by that user. Thus, once a user expresses a preference for a given content to appear in a particular location and manner on the Web page, that preference will be stored in the database. Following a subsequent request by that user, the content will again be displayed in the same location and manner. The '530 patent, in contrast, discloses a method that is capable of accommodating only a user's current request that information be displayed according to a selected template, however that information is not stored in a database for future retrieval, and the user must reselect his preferred content template each time he requests information from the server.

### B.  *The Prior Art*

#### 1.  Fishwrap

Fishwrap was an online newspaper developed at the Massachusetts Institute of Technology that used CGI script to dynamically generate HTML-formatted Web pages in response to its reader's preferences for specific categories of content.  In its fully developed form, Fishwrap contained a "self-organization feature" which recorded a user's reading habits in a database.  When the user next visited the Fishwrap site, the stored information was fed into an algorithm, the output of which was used to dynamically generate the format of the Web page to reflect the user's implied preferences.  Thus, if a user repeatedly viewed articles about sports first, or more frequently, return visits to the Fishwrap site would result in sports stories being displayed higher up on the viewed Web page.

#### 2.  Bobo

The Bobo patent, U.S. Patent No. 5,675,507 ("Bobo") has a priority date of April 28, 1995.  Bobo claims a system wherein users may access faxes by receiving HTML pages on the Web.  Specifically, Bobo's claim 1 teaches:

> A network message storage and delivery system, comprising:
>
> means for receiving an incoming call and for detecting an address signal associated with said incoming call, said address signal associated with a user of said message storage and delivery system;

means for receiving a message accompanied with said address signal, said message being in a first file format;

means for converting said message from said first file format to a second file format;

means for storing said message in said second file format in a storage area;

means for receiving a request from said user for said message and for retrieving said message from said storage area; and

means for transmitting a least a portion of said message in said second file format to said user;

wherein said portion of said message is transmitted to said user over the network, said second file format is a mixed media page layout language and comprises a standard generalized mark-up language.

Bobo col.20 l.64-col.21 l.18. The system allows the user to view faxes as text only, as text accompanied by a full-size image of the first page of the fax, or as text accompanied by a smaller thumbnail image of the first page of the fax. The user can also elect to view images of all of the pages of the fax in either full-size or thumbnail form. The user's preferred method of viewing the faxes is stored in a database to be retrieved for future inquiries.

### 3.  HTGrep

The launch of the HTGrep program ("HTGrep") was announced by its developer. Oscar Nierstrasz ("Nierstrasz") to public user groups in May 1994.  Nierstrasz posted information about HTGrep, including the address of his public domain website where the source code for HTGrep could be downloaded.  HTGrep is a program that performs searches of remote files employing user-selected keywords and returns results in an HTML-formatted Web page.  When a user requests a search, the program allows the user to choose whether the search results will be displayed in paragraph form or in a numbered or bullet-pointed list.

### C.  Procedural History

In 2006, Ablaise accused Dow Jones of infringing its '737 and '530 patents and simultaneously offered a licensing agreement.  Dow Jones spurned Ablaise's offer of a license and filed suit in the U.S. District Court for the District of Columbia, seeking declaratory judgment that both patents were invalid and not infringed.  Ablaise counterclaimed for infringement of both patents.

The district court held a *Markman* hearing on June 6, 2007 and subsequently issued its claim construction order on July 11, 2007.  Subsequent to the *Markman* hearing, Ablaise offered Dow Jones a covenant not to sue on the '530 patent if Dow Jones would dismiss its claim of invalidity.  Dow Jones demanded that Ablaise include News Corporation, Dow Jones' parent company, in the covenant. Ablaise balked at expanding the covenant to include News Corporation (which had acquired Dow Jones subsequent to date on which the suit was filed) and refused to drop its invalidity claim.

On October 15, 2008, the district court denied without prejudice Ablaise's motion to dismiss the invalidity claim with respect to the '530 patent on the grounds that its

offer of a covenant not to sue Dow Jones for infringement of that patent divested the court of subject matter jurisdiction. Dow Jones subsequently filed a motion for summary judgment of invalidity against the asserted claims of both the '737 and '530 patents on the grounds of obviousness under 35 U.S.C. § 103 and anticipation by the prior art under 35 U.S.C. § 102(a). On July 15, 2009, the district court granted Dow Jones' summary judgment motion, holding that the asserted claims of the '737 patent were obvious in light of Bobo and the general knowledge in the field and that the asserted claims of the '530 patent were anticipated by HTGrep. This appeal followed.

## II.

### A.  Standard of Review

We review a district court's grant of summary judgment of invalidity on grounds of anticipation or obviousness de novo. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1318 (Fed. Cir. 2008). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether summary judgment was appropriate, we view the evidence in a light most favorable to the opposing party and resolve doubts in its favor. *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998). The district court's claim construction is likewise a matter of law and is reviewed without deference. *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1371 (Fed. Cir. 2005). However, in reviewing a district court's claim construction, this court takes into account the views of the trial judge, as well as the record of the

trial, which helped that judge to understand the terms of the claim. *Id.* Though we review those views and that record "de novo," "common sense dictates that the trial judge's view will carry weight." *Id.* (quoting *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (Plager, J., concurring)).

## *B. Analysis*

### 1. Subject Matter Jurisdiction and the '530 Patent

As a threshold matter, this court must decide whether Ablaise's offer of a covenant not to sue Dow Jones for infringement of the '530 patent was sufficient to divest the district court of subject matter jurisdiction over Dow Jones' suit for declaratory judgment of invalidity. Specifically, the proffered covenant stated that:

> Ablaise, on behalf of itself and any successors-in-interest to the '530 patent, will release and unconditionally covenant not to sue Dow Jones & Company, Inc., or any of its subsidiaries or divisions, including but not limited to Dow Jones Reuters Business Interactive, LLC d/b/a Factiva ("Dow Jones"), for infringement of the '530 patent as of the date of this agreement based on Dow Jones' manufacture, importation, use, sale and/or offer for sale of currently existing products or use of methods. This covenant does not include Dow Jones' parent company, News Corporation, or any of News Corporation's subsidiaries, divisions or other affiliates which are not expressly included in the covenant.

J.A. at 88 n.1.

In response to an assertion by Dow Jones that the covenant did not cover past products or existing licenses, Ablaise clarified that "Ablaise incorporates herein that

Ablaise's covenant not to sue extends to Dow Jones' past products or use and includes Dow Jones' licensees' use of any Dow Jones' website or product." *Id.* However, Dow Jones demanded that Ablaise include Dow Jones' parent corporation, News Corporation, in the covenant. Ablaise refused to expand its covenant to include News Corporation (which had acquired Dow Jones subsequent to the filing of its suit) and Dow Jones consequently refused to dismiss its claim of invalidity against the '530 patent.

Subject matter jurisdiction in a declaratory judgment suit depends upon the existence of "a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," and the plaintiff bears the burden of proving the existence of such a controversy throughout the litigation. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)); *see also Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (the actual controversy "must be extant at all stages of review, not merely at the time the complaint is filed"). According to the Supreme Court, "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

In its order denying Ablaise's motion to dismiss for lack of subject matter jurisdiction, the district court reviewed this court's precedential case law. The district court noted that we have held, in a line of cases beginning with *Super Sack Manufacturing Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1060 (Fed. Cir. 1995), that a covenant not to sue for patent infringement divests the trial

court of subject matter jurisdiction over claims that the patent is invalid, because the covenant eliminates any case or controversy between the parties. *See Intellectual Prop. Dev., Inc. v. TCI Cablevision of Calif., Inc.*, 248 F.3d 1333, 1342 (Fed. Cir. 2001) (statement of non-liability divested the district court of Article III jurisdiction); *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855 (Fed. Cir. 1999) ("[A] covenant not to sue for any infringing acts involving products 'made, sold, or used' on or before the filing date is sufficient to divest a trial court of jurisdiction over a declaratory judgment action.").

Furthermore, the district court recognized the exception to *Super Sack* that this court carved out in *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340 (Fed Cir. 2005). In *Fort James*, the district court dismissed the alleged infringer's invalidity claim against the patent-in-suit when the patent holder submitted a covenant not to sue. 412 F.3d at 1344-45. However, the covenant not to sue was not offered by the patentee until after the jury had determined that the patent was not infringed. *Id.* We reversed the dismissal, holding that:

> In *Super Sack* and its progeny, the patentee's covenant not to sue was filed prior to consideration or resolution of the underlying infringement claim. In such circumstances, the promise not to sue obviated any reasonable apprehension that the declaratory judgment plaintiff might have of being held liable for its acts of infringement.... Here, however, the Post-Verdict Covenant had no effect on Fort James's claim for infringement, because that controversy had already been resolved by the jury's verdict. The question then becomes whether the court retained jurisdiction to hear Solo Cup's declaratory judgment counterclaim after the jury determined that Solo Cup's products do not infringe Fort James's patents.

*Id.* at 1348 (internal citations omitted).

We affirmed the jurisprudence engendered by *Super Sack* in *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340 (Fed. Cir. 2007). In *Benitec*, we held that a pretrial tender of a covenant not to sue divested the district court of subject matter jurisdiction because, unlike *Fort James*, the covenant was tendered "before … the considerable effort connected [with a trial] had taken place. 495 F.3d at 1347. More importantly, however, in *Fort James*, the jury's verdict of non-infringement had removed any reasonably apprehensible justiciable controversy between the parties. *Fort James*, 412 F.3d at 1348.[1]

More recently, this court held that "whether a covenant not to sue will divest the trial court of jurisdiction depends on what is covered by the covenant." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 556 F.3d 1294, 1297 (Fed. Cir. 2009). In *Revolution Eyewear*, the patentee

---

[1]    In his dissent, Judge Dyk stated that, in his view, there was a different test for determining whether a case or controversy exists when the allegation of infringement is withdrawn during the course of the litigation. *Benitec*, 495 F.3d at 1350. According to Judge Dyk, if a patentee files suit alleging infringement and the infringement claim is subsequently mooted, a counterclaim for invalidity should not be dismissed unless the patentee demonstrates that there is no possibility of a future controversy with respect to invalidity. *Id.* (citing *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 98 (1993)). Judge Dyk noted that Benitec did not offer a formal covenant not to sue before the district court, rather, it stated in its motion to dismiss that it "could only bring new claims if [the accused infringer] Nucleonics is ultimately successful in obtaining FDA approval for its infringing products or otherwise engages in infringing activities not otherwise permitted under the § 271(e) exemption." *Benitec*, 495 F.3d at 1351. However, Judge Dyk noted, Benitec offered no covenant with respect to future human or animal products or animal research. *Id.* at 1352.

offered a covenant not to sue that this court found did not bar future infringement actions if the accused infringer again offered for sale the allegedly infringing articles.[2] 556 F.3d at 1300. In its opinion, this court applied the *MedImmune* test, as set forth in *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372 (Fed. Cir. 2007), holding that:

> [W]here a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where the party contends that it has the right to engage in the accused activity without a license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights.

*Revolution Eyewear*, 556 F.3d at 1297.

In the case at bar, the district court stated that:

If *Benitec's* rule were applied formalistically here, where the parties have not submitted their summary judgment briefs (or had not, when I denied

---

[2] The covenant not to sue in question in that case stated:

> Revolution and counter-defendant [ ] hereby unconditionally covenant not to sue Aspex for patent infringement under the '913 patent based upon any activities and/or products made, used, or sold on or before the dismissal of this action (03-5965 case).

*Revolution Eyewear*, 556 F.3d at 1296. The covenant did not preclude future infringement actions should Aspex recommence sales of the accused infringing device after the dismissal of the action. The covenant not to sue in the case at bar is not so limited.

the Ablaise motion to dismiss), and where a trial date has not been set, the result would have to be the dismissal of Dow Jones' declaratory judgment claims as to the '530 patent.

*Dow Jones & Co., Inc. v. Ablaise Ltd.*, 583 F. Supp. 2d 41, 44 (D.D.C. 2008). However, the district court noted that he regarded our *Super Sack-Benitec* rule to be inapplicable to this case, for what he believed to be "sound prudential reasons" and for "reasons of the efficient utilization of the litigation resources of both bench and bar." *Id.* at 268. Likening the situation to one in which a federal trial court may assert supplemental jurisdiction under 28 U.S.C. § 1367(a), the district court noted that the relationship between the '767 and '530 patents was so close that the validity or invalidity of one may be said to form part of the same "case or controversy" as the other. Furthermore, the district court noted that Ablaise has asserted the '530 patent in at least nine other actions, and that resolving the validity of the '530 patent would "help move those cases forward." Finally, the district court quoted Hart and Wechsler in support of his denial of Ablaise's motion:

> There is an important public interest in protecting the legal system against manipulation by parties, especially those prone to involvement in repeat litigation, who might contrive to moot cases that otherwise would be likely to produce unfavorable precedents.

J.A. at 269 (citing H.M. Hart and H. Wechsler, THE FEDERAL COURTS AND THE FEDERAL SYSTEM 204 (5th ed. 2003)).

The district court's argument concerning the expenditure of precious and admittedly overstretched judicial resources is certainly well-taken; however, its denial of Ablaise's motion to dismiss is without support in the law and contrary to this court's jurisprudence established by

*Super Sack* and continuing, post-*MedImmune*, through *Revolution Eyewear*.  In the case at bar, Ablaise's covenant not to sue avowed that Ablaise would not sue Dow Jones for any acts of infringement of its '530 patent.  The covenant therefore extinguished any current or future case or controversy between the parties, and divested the district court of subject matter jurisdiction.  Subject matter jurisdiction is a threshold requirement for a court's power to exercise jurisdiction over a case, and no amount of "prudential reasons" or perceived increases in efficiency, however sound, can empower a federal court to hear a case where there is no extant case or controversy.

Furthermore, the district court judge's analogizing to supplemental jurisdiction as a rationale for retaining jurisdiction in this case was inapposite.  Pursuant to 28 U.S.C. § 1367(a), federal courts may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  *In re Ullico Inc. Litig.*, 605 F. Supp. 2d 210, 222-23 (D.D.C. 2009).  However, each of the claims over which a district court exercises its supplemental jurisdiction must have standing on its own.  According to the U.S. Supreme Court: "a plaintiff must demonstrate standing for each claim he seeks to press" and "for each form of relief" that is sought.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  Consequently, the district court erred in denying Ablaise's motion to dismiss Dow Jones' claim seeking invalidity of the '530 patent.

Dow Jones argues that the covenant not to sue does not extinguish the parties' controversy regarding the '530 patent because it does not include Dow Jones' "affiliates", *viz.*, Dow Jones' parent company, News Corporation, as well as "any of News Corporation's subsidiaries, divisions, or other affiliates which are not expressly included in the

covenant." Joint App'x at 88 n.1. Dow Jones contends that because Ablaise has, in the past, repeatedly sought damages from, and injunctive relief against, Dow Jones' [unnamed] affiliates, it cannot subsequently deny that the controversy likewise extends to those affiliates. Consequently, according to Dow Jones, Ablaise's covenant not to sue (which explicitly excludes News Corporation) is insufficient to extinguish the case or controversy with respect to Dow Jones. Dow Jones further contends that because Ablaise sought discovery from Dow Jones' affiliates (including News Corporation) those affiliates are therefore part of the controversy, and Ablaise's covenant not to sue is insufficient to extinguish the case. Dow Jones also notes that because Ablaise, in its motion to dismiss, sought to bind News Corporation to any finding regarding the validity of the '530 patent, it and its affiliates are consequently *de facto* parties to the case and, again, the covenant not to sue is insufficient to extinguish the controversy.

Dow Jones fails to provide a precise definition of what it means by "affiliates", but with respect at least to News Corporation, its attempt to insinuate the latter as a party into this case fails. News Corporation, of which Dow Jones is a subsidiary, is a legally distinct entity from Dow Jones, and it is well-settled law that, absent a piercing of the corporate veil (which neither party alleges), a parent company is not liable for the acts of its subsidiary. *See, e.g.*, *Penick v. Frank E. Basil, Inc. of Del.*, 579 F. Supp. 160, 165 (D.D.C. 1984).

Because News Corporation is insulated from liability should Dow Jones be found liable for infringement, Ablaise's infringement suit against Dow Jones cannot be said to constitute a case or controversy involving News Corporation or its divisions and subsidiaries which are legally distinct entities from Dow Jones. Whether Ablaise at present (or in the future) seeks to assert the '530

patent against News Corporation is consequently irrelevant to whether a controversy exists between Ablaise and Dow Jones in the case at bar. Consequently, the covenant not to sue proffered by Ablaise extinguishes the controversy between Ablaise and Dow Jones and divests the district court of its Article III jurisdiction. We therefore reverse the order of the district court's denial of Ablaise's motion to dismiss Dow Jones' claim seeking invalidity of the '530 patent.

## 2.    *Invalidity of the '737 Patent[3]*

The district court granted Dow Jones' motion for summary judgment of invalidity of the '737 patent on the grounds that the asserted claims were obvious under 35 U.S.C § 103. A claim is obvious if: "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). This analysis requires an assessment of the "interrelated

---

[3]    In a recent submission to this court, Dow Jones presented a copy of a final Office Action, dated December 23, 2009, by the U.S. Patent and Trademark ("PTO") Office in connection with an *ex parte* reexamination of the '737 patent. The Office Action constitutes a final rejection by the Examiner of claims 1-6 of the '737 patent (including the claims asserted in this appeal) as invalid under 35 U.S.C. § 102(a) as anticipated by the Bobo prior art reference as well as another prior art reference not raised in this appeal (Varela). An ultimately final rejection of the claims by the PTO would fatally undermine the legal presumption of the validity of the '737 patent and would be sufficient by itself to moot this entire portion of the appeal and warrant affirmation of the district court's finding of invalidity of the '737 patent (although on grounds of anticipation rather than obviousness). However, the *ex parte* reexamination has not yet been completely resolved.

teachings of [the prior art]; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art." *KSR Int'l. Co. v. Teleflex, Inc.*, 550 U.S. 398, 401 (2007).

The district court noted that Ablaise conceded that an artisan of ordinary skill would have been aware that HTML tags affect content location on a Web page. Nor did Ablaise dispute that "[b]y May 15, 1995, HTML, including the functions of the tags used therein, was well known to persons of skill in the art." Moreover, Ablaise did not dispute Dow Jones' expert witness, Dr. Bestavros' ("Bestavros") claim that "[m]any of the HTML tags in use prior to May 15, 1995 control[led] the location on the web page at which a certain piece of data (such as text or an image) [was] to be displayed." Indeed, Ablaise does not dispute Dow Jones' contention that Fishwrap used HTML tags to affect the location of content on the page.

The district court found that there was undisputed evidence that a modification incorporating location-changing HTML tags into the Bobo prior art reference would have been straightforward and obvious to an artisan of ordinary skill. As an example, the district court pointed to the undisputed fact that the Bobo patent employs the HTML <image> tag, which is used to display an image on the Web page. Ablaise conceded that such a tag, accompanied by an alignment tag, would meet the "formatting data" limitation of claim 1. Therefore, a person of ordinary skill in the art would simply have to add an alignment tag (already well known in HTML) to the existing <image> tag recited in the Bobo patent to meet all of the limitations of claim 1 of the '737 patent. Because "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results", the district court found that claim 1 was invalid as obvious under 35 U.S.C.

§ 103. *KSR*, 550 U.S. at 416. Further, the district court credited Bestavros' testimony that, with respect to an artisan's motivation to combine the elements, "[b]etween 1990 and May 15, 1995, with the pervasiveness and wide acceptance of the web, there was a tremendous amount of technological development seeking to increase the usability of web pages and to bring the established features of various computer programs to the web platform." Moreover, the court noted that both parties acknowledged that one of the "established feature" of non-web programs was the capacity to personalize formatting. Taken together, the court found that these facts presented clear and convincing evidence of both design need and market pressure to add location-changing HTML tags to the Bobo patent.

The district court discounted as weak Ablaise's submitted evidence of secondary indicia of non-obviousness, *viz.*, a long-felt but unmet need for the patented invention, skepticism about the possibility of the invention, and the commercial success of the invention. Furthermore, it noted that the revenues that Ablaise had generated from the '737 patent had been largely achieved though the use of coercive licensing agreements that had more to do with avoiding the costs of litigation than with the novelty of the patent.

On appeal, Ablaise argues that the district court came to its conclusion without explaining why an artisan of ordinary skill would have been motivated to look at the teachings of a fax converter to change the location of content, especially when the converter lacked that utility. Ablaise also notes that the district court lacked expert testimony describing how the Bobo fax converter could be reprogrammed to allow for content to be moved around the screen. Further, according to Ablaise, the district court made its obviousness conclusion without addressing Ablaise's expert's opinions that "[t]he format identifier

that is used to locate selected content on the web page is not present nor taught [sic] in Bobo … and is not an obvious feature, function or even extension to this patent."

Ablaise argues that the Bobo reference, in combination with an HTML align image tag, does not disclose the limitations related to the use of a format identifier and does not provide the same content in different formats for different users.   Ablaise contends that Bobo is "focused exclusively on generating different type of content or different amounts of content, not changing the location of content based on a format identifier."  Ablaise maintains that the user options for viewing the Web page that Bobo presents are all related to varying the amount or type of information that will be supplied with the listing of the fax message and that that is different from changing the location of the information within the Web page.

Ablaise also claims that the district court erred because it improperly ignored several of the limitations missing in Bobo when performing its obviousness analysis.  Specifically, according to Ablaise, the district court held that the only limitation in dispute between Bobo and the prior art was the "formatting data" limitation, when several other limitations were also in dispute.  Rather, the asserted claims require a system that uses a format identifier to dynamically generate the HTML tags that specify the location of text or graphics.  Ablaise points to the testimony of its expert, Mr. Geoff Mulligan ("Mulligan") who stated that the Bobo patent does not disclose the use of format identifiers, which it claims are a separate and distinct claim element from formatting data. Mulligan opined that limitations of receiving format identifiers, selecting function based on those format identifiers, and executing those functions to generate formatting data were all missing from the Bobo patent.

Ablaise's arguments miss the mark entirely.  The district court correctly recognized that the Bobo patent was

designed to permit a user to vary the content of the Web page in question according to her preferences, but also recognized that it would have been obvious to an artisan of ordinary skill to use HTML language that was well-understood at the time to position the content in different locations on the screen. Consequently, we see no fault in the district court's reasoning. Furthermore, Ablaise elides the fact that, as the district court recognized, it conceded that an <image> tag accompanied by an alignment tag would meet the "formatting data" limitation of claim 1.

Ablaise also argues that the district court improperly relied on hindsight to combine an HTML image align tag from the '737 patent with Bobo. Specifically Ablaise faults the district court's finding that people of ordinary skill would have been motivated by design and market pressures to bring non-Web-based (i.e., local computer) functionality to the Web and thus create the invention. Ablaise complains that the district court ignored Mulligan's opinion that the invention disclosed by the '737 patent was not obvious, but was rather a significant advance over the prior art and that: "[t]he format identifier that is used to locate selected content on the web page is not present nor taught in Bobo or CGI and is not an obvious feature, function or even extension to this patent." According to Ablaise, Mulligan provided no support whatsoever for the district court's conclusion that there was market pressure to bring personalized formatting to the web.

However, Ablaise does not dispute that there was both "design need and market pressure to add location-changing HTML tags to the Bobo patent." Nor does Ablaise dispute that personalized formatting was well-known on non-Web products such as database systems or that during the relevant period there was an effort in the

art to bring established features of non-Web programs to the Web.

Indeed, Ablaise implicitly concedes that the only differences between Bobo and the invention disclosed in the '737 patent is the extension of the user-selected display options presented by Bobo to personalize the location of text or graphics on the page. Such changes in location were well-known in both non-Web applications and in the HTML language extant at the time and known to artisans of ordinary skill. Given all of these factors, the district court did not err in determining that the invention disclosed in the '737 patent would have been obvious to an artisan of ordinary skill in light of Bobo and the known art.

Finally, the district court correctly characterized Ablaise's reliance on the secondary consideration of market skepticism as "weak." The three pieces of evidence proffered by Ablaise do not directly address whether there was actual skepticism concerning the invention of dynamically-generated personalized Web pages. The reference entitled "The Krakatoa Chronicle – An interactive, personalized newspaper on the Web" (the "Kamba reference"), published shortly after the filing date of the '737 patent, recognizes that Fishwrap and other online publications were using HTML to vary the format of Web pages for individual users, and that such personalization had strong appeal to users. The Kamba reference suggests that the embedding of Java-based applications in HTML language might provide a more powerful and flexible system to provide continuous interaction between user and server, but does not express any direct skepticism concerning the feasibility of dynamically-generated, HTML-based Web pages.

Ablaise also points to an e-mail exchange between an unidentified student and Dr. Pascal Chesnais (the designer of Fishwrap) in which the student complains about

the self-organizing features of Fishwrap. Dr Chesnais responded that the student "better get used to self-organizing paper. It will be around for quite a while." Ablaise's argument that this evidence shows that Dr. Chesnais did not reach the same insight as the inventors of the '737 patent is not persuasive. A much more plausible interpretation of Dr. Chesnais' response is that dynamically-generated content on Web pages had come to stay due to the popularity and future promise of such content.

The third reference allegedly showing skepticism by skilled artisans is the M.I.T. undergraduate thesis written by Douglas Koen entitled "Automated Restructuring of an Electronic Newspaper" (the "Koen reference"), which relates Koen's work on Fishwrap. The Koen reference states:

> Another user suggested that the problem of paper structuring could be satisfactorily solved by providing the user with a mechanism for moving topics and sections around manually, and in this way, he would be able to select the paper structure that appealed to him. While this solution might be equitable for technically inclined users, the object of this research is to increase automation and responsiveness to the reader's wishes without the need for explicit intervention on his part.

J.A. at 352-53. This quotation, cherry-picked by Ablaise from a section reviewing focus group responses to Fishwrap, does not express skepticism that dynamically-generated Web pages were unfeasible or nonobvious. It merely states that Fishwrap's purpose was to automatically change the layout of the Web content without any intervention or expression of preference on the reader's part.

In summary, Ablaise's assertion that there were secondary indicia of skepticism that rendered the invention of the asserted claims nonobvious is supported only by evidence that is irrelevant and not supportive of its claim. Consequently, we affirm the district court's grant of summary judgment of invalidity of the '737 patent on grounds of obviousness under the Bobo prior art in view of general knowledge in the field.

## III.

We reverse the district court's denial of Ablaise's motion to dismiss Dow Jones' invalidity claim against the '530 patent and affirm the district court's grant of summary judgment that the asserted claims of the '737 patent are invalid as obvious. Because the district court lacked subject matter jurisdiction to hear Dow Jones' claim against the '530 patent, we need not reach the question of whether the asserted claims of that patent are invalid as anticipated by the prior art.

**REVERSED-IN-PART AND AFFIRMED-IN-PART**